FIRST DIVISION
September 30, 2010

No. 1-05-0599

| | |
|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) Appeal from the |
| | ) Circuit Court of |
| Plaintiff-Appellant, | ) Cook County. |
| | ) |
| v. | ) No. 03 CR 19807 |
| | ) |
| OMAR AL BUREI, | ) |
| | ) Honorable |
| Defendant-Appellee. | ) David P. Sterba, |
| | ) Judge Presiding. |

JUSTICE HALL delivered the opinion of the court:

Pursuant to Supreme Court Rule 604(a)(1) (210 Ill. 2d R. 604(a)(1), the Attorney General appealed from the granting of defendant Omar Al Burei's motion to suppress evidence.  As the defendant did not file a brief, the appeal was taken on the Attorney General's brief only.  On December 5, 2006, this court affirmed the granting of the defendant's motion to suppress in an order pursuant to Supreme Court Rule 23 (Official Reports Advance Sheet No. 15 (July 16, 2008), R. 23, eff. May 30, 2008).  People v. Al Burei, No. 1-05-0559 (2006) (unpublished order under Supreme Court Rule 23).  The Attorney General filed a petition for leave to appeal.

On November 26, 2008, our supreme court denied leave to appeal but issued a supervisory order directing this court to

vacate and reconsider its judgment in light of People v. Cosby, 231 Ill. 2d 262, 898 N.E.2d 603 (2008). Accordingly, we vacated our judgment in Al Burei and considered whether Cosby required a different result. After finding Cosby distinguishable on its facts from the present case, we affirmed the granting of the motion to suppress. See People v. Al Burei, 391 Ill. App. 3d 1, 908 N.E.2d 538 (2009) (Al Burei II). The Attorney General filed a petition for leave to appeal.

On May 26, 2010, our supreme court denied the petition for leave to appeal but issued a supervisory order directing this court to vacate and reconsider its judgment in light of People v. Oliver, 236 Ill. 2d 448, 925 N.E.2d 1107 (2010). In accordance with the supervisory order, we vacate our judgment in Al Bueri II and consider whether the decision in Oliver requires a different result. We conclude it does not and affirm the granting of the motion to suppress. The pertinent facts are set forth below.

The defendant was indicted and charged with the following offenses: transportation of unstamped cigarettes with intent to evade the cigarette tax (35 ILCS 130/9c (West 2002)); transportation of unstamped cigarettes without a permit (35 ILCS 130/9c (West 2002)); and possession of unstamped cigarettes with intent to sell (35 ILCS 130/24(a) (West 2002)). The defendant

2

filed a motion to suppress evidence. At the hearing on the motion, the following evidence was presented.

BACKGROUND

I. The Defendant

Shortly after 1 p.m. on July 11, 2003, the defendant was a passenger in a minivan driven by his friend, Majdi Ghaban. The car was owned by the defendant. Mr. Ghaban was driving because the defendant's driver's license was suspended. The two men were on their way to get something to eat when the minivan was stopped by a police officer. The officer spoke to Mr. Ghaban, advised him that he had almost hit a bus and ordered him out of the minivan. After speaking with Mr. Ghaban for about three minutes, the officer approached the defendant and asked for his driver's license. After the defendant tendered his license to the officer, the officer ordered the defendant to exit the car. The officer then began to search the interior of the car. He opened the glove compartment and removed whatever was inside. The officer then informed the defendant that he was under arrest. The officer also searched the back of the minivan but did not remove anything. The officer did not show the defendant any warrants for his arrest, any search warrants and he did not ask

the defendant's permission to search the minivan. The defendant was then taken to the police station.

On cross-examination, the defendant acknowledged that there were boxes of cigarettes in the back of the minivan. He further acknowledged that he told the officer that the cigarettes were his. Questioned as to whether the officer asked if he could take a look in the minivan, the defendant testified, "He stood by the window on the right side."

## II. Officer Glenn Tienstra

Shortly after 1 p.m. on July 11, 2003, while on routine patrol, Officer Tienstra observed a white minivan make a U-turn in front of a Pace bus. The minivan also had a cracked windshield. Officer Tienstra conducted a traffic stop of the minivan. He asked the driver, Mr. Ghaban, for his license. Mr. Ghaban displayed nervous behavior and kept looking at his passenger. Concerned for his safety, Officer Tienstra asked Mr. Ghaban to exit the minivan and step to the back of the vehicle. When questioned why he appeared nervous, Mr. Ghaban stated that this was the first time he had ever been stopped by the police. When Officer Tienstra asked if there was anything illegal inside the minivan, Mr. Ghaban responded that he did not know and that

4

the minivan belonged to his passenger, the defendant.

Within five minutes of the stop, Officer Beckwith arrived on the scene. He waited with Mr. Ghaban while Officer Tienstra spoke with the defendant. Again for safety concerns, Officer Tienstra had the defendant step out of the minivan and identify himself. The defendant did not produce a driver's license but did identify himself to the officer. Officer Tienstra asked the defendant why Mr. Ghaban was so nervous and why the defendant was not driving. The defendant told him that he was not driving because he was busy on his cell phone. When Officer Tienstra asked if there was anything illegal in the minivan, the defendant stated not that he knew of and gave Officer Tienstra permission to search the minivan. Officer Tienstra instructed the defendant to go to the back of the minivan with Officer Beckwith, while he looked inside the vehicle. Officer Tienstra searched the entire minivan and located five cardboard boxes filled with cartons of cigarettes. Questioned about the cigarettes, the defendant stated that he purchases cigarettes in Kentucky and sells them in Illinois and Indiana. Officer Tienstra opened some of the boxes and ascertained that the cigarettes in those boxes had Kentucky stamps but not Illinois stamps.

5

On cross-examination, Officer Tienstra stated that he issued Mr. Ghaban a citation for the cracked windshield and a verbal warning for the U-turn. He issued the ticket at the police station.[1] Officer Tienstra requested that the defendant exit the minivan due to safety concerns, even though the traffic stop was made across the street from the police station and another officer was then on the scene. The time between the stop and the defendant exiting the vehicle was approximately five minutes at the most. The defendant did not appear nervous and was not committing any crimes. His statements were not inconsistent with those of Mr. Ghaban. Officer Tienstra denied that he had not asked the defendant's permission to search the minivan. Questioned by the court, Officer Tienstra testified that approximately five minutes elapsed between the time of the stop and the search of the minivan.

In ruling on the motion to suppress, the court found that

---

[1] Officer Tienstra testified that the driver, Mr. Ghaban, drove the vehicle across the street to the police station. The officer did not testify whether he ordered Mr. Ghaban to drive to the police station or suggested to him that he do so.

No. 1-05-0599

Officer Tienstra was justified in stopping the minivan. The court further found that Officer Tienstra asked for and received the defendant's consent to search the minivan. However, the court further found that the officer's questioning of the defendant "was completely unrelated to the initial purpose of the stop." The circuit court granted the motion to suppress. The Attorney General filed a certificate of impairment and timely appealed the circuit court's order.

## ANALYSIS

The sole issue on appeal is whether the circuit court erred in granting the motion to suppress evidence.

### I. Standard of Review

Where a motion to suppress involves credibility assessments or factual determinations, a reviewing court will reverse a trial court's ruling only if it is manifestly erroneous. People v. Driggers, 222 Ill. 2d 65, 70, 853 N.E.2d 414 (2006). Where, as here, the appeal concerns the trial court's ultimate ruling on the defendant's motion to suppress, our review is de novo. Driggers, 222 Ill. 2d at 70.

### II. Discussion

"When a police officer observes a driver commit a traffic

7

No. 1-05-0599

violation, the officer is justified in briefly detaining the driver to investigate the violation." People v. Ramsey, 362 Ill. App. 3d 610, 614, 839 N.E.2d 1093 (2005). "A temporary detention of an individual during a vehicle stop constitutes a seizure of his person within the fourth amendment, even if the stop is brief and for a limited purpose." Ramsey, 362 Ill. App. 3d at 614. The Supreme Court recently confirmed that in a traffic stop, a passenger as well as the driver is "seized." See Arizona v. Johnson, 555 U.S. ___, ___, 172 L. Ed. 2d 694, 703, 129 S. Ct. 781, 787 (2009).

As a general rule, a fourth amendment challenge to the reasonableness of a traffic stop is analyzed under the principles set forth in Terry v. Ohio, 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868 (1968). People v. Gonzalez, 204 Ill. 2d 220, 226, 789 N.E.2d 260 (2003), abrogated on other grounds by People v. Luedemann, 222 Ill. 2d 530, 857 N.E.2d 187 (2006)[2] (Terry

---

[2]Luedemann held that cases such as Gonzales, stating that "community caretaking" was a label to describe consensual encounters, should no longer be followed on those specific points. Luedemann, 222 Ill. 2d at 548.

8

analysis applies even though the vehicle stop was supported by probable cause). A <u>Terry</u> analysis includes a dual inquiry: (1) "'whether the officer's action was justified at its inception,' and (2) 'whether it was reasonably related in scope to the circumstances which justified the interference in the first place." <u>Gonzales</u>, 204 Ill. 2d at 228, quoting <u>Terry</u>, 392 U.S. at 19-20, 20 L. Ed. 2d at 905, 88 S. Ct. at 1879.

The first inquiry of the <u>Terry</u> analysis is satisfied as there is no dispute that Officer Tienstra had probable cause to stop the minivan. In addition to the abrupt traffic maneuver, Officer Tienstra observed the minivan's windshield was cracked. See 625 ILCS 5/12-503(e) (West 2002) (Illinois Vehicle Code requires that the windshield be unobstructed); see also <u>Ramsey</u>, 362 Ill. App. 3d at 613 (cracked windshield gave officer probable cause to initiate a valid traffic stop).

Under the scope requirement, if the questioning was unrelated to the initial justification for the stop, the court must consider whether the questioning impermissibly prolonged the detention or changed the fundamental nature of the stop. <u>Gonzalez</u>, 204 Ill. 2d at 235. Recent case law has modified the court's considerations in determining whether the scope

9

No. 1-05-0599

requirement was violated.

In Cosby, our supreme court noted that Gonzales had been overruled to the extent that it holds that the reasonableness of a traffic stop must be judged not only by its duration but also by the additional criterion of whether the actions of the officer altered the fundamental nature of the stop. Cosby, 231 Ill. 2d at 276, citing People v. Harris, 228 Ill. 2d 222, 244, 886 N.E.2d 947 (2008). In other words, only the duration portion of the Gonzales analysis remains. Cosby, 231 Ill. 2d at 276.

In Cosby, two cases were consolidated for review. In both cases, drivers were lawfully stopped for traffic violations. After the stops were concluded, the police asked permission to search the vehicles. Mr. Cosby consented to the search, which led to the discovery of drug paraphernalia in his car. His motion to suppress was denied, and he was convicted of possession of drug paraphernalia. On review by the appellate court, the court relied on Gonzalez and held that the motion to suppress should have been granted as the police questioning of Mr. Cosby and the subsequent search unreasonably prolonged his detention and changed the fundamental nature of the stop. Cosby, 231 Ill. 2d at 267.

10

In the second of the consolidated cases, after he was stopped for a traffic violation, Mr. Mendoza provided his license and proof of insurance, which proved to be valid. The police officers then asked for permission to search his car. Mr. Mendoza refused. While one of the officers observed a gun under the driver's seat, the other officer, unaware of the gun, allowed Mr. Mendoza to drive away. The officers pursued the car and arrested Mr. Mendoza. Mr. Mendoza's motion to suppress was granted based on Gonzalez. On review by the appellate court, the court rejected Gonzalez but determined that once his license and insurance card had been returned to him, the traffic stop ended. The appellate court concluded that a second seizure had occurred when the officer questioned Mr. Mendoza, asking permission to search his car. Because there were two officers flanking his car and because he was not told he was free to leave, the appellate court concluded that Mr. Mendoza would not have felt free to leave. Since the gun was not detected until after he was seized a second time, there was no basis for the second seizure. Cosby, 231 Ill. 2d at 270.

The supreme court noted that "[t]he requests for consent to search in both of the instant cases followed the officers'

11

returning of the defendants' paperwork.  At that point, the traffic stops came to an end.  The relevant question then [was] whether the officers' actions after the initial traffic stops had concluded constituted a second seizure of either defendant." Cosby, 231 Ill. 2d at 276.  In Mr. Cosby's case, the supreme court determined that the request to search his car occurred after the traffic stop had been concluded and thus did not constitute a new seizure for fourth amendment purposes.  The court rejected Mr. Cosby's argument that the request to search was part of the traffic stop.  Based on the record, the court found that the request to search occurred shortly after the return of the paperwork to Mr. Cosby and not simultaneously as Mr. Cosby contended.  The court then addressed whether Mr. Cosby had been seized a second time.  Applying the factors in United States v. Mendenhall, 446 U.S. 544, 64 L. Ed. 2d 497, 100 S. Ct. 1870 (1980), the court determined that Mr. Cosby was not seized at the time he consented to the search and, therefore, his consent to search was voluntary.  Cosby, 231 Ill. 2d at 284-85.

Likewise, in the case of Mr. Mendoza, the supreme court applied the Mendendall factors and concluded that Mr. Mendoza was not seized by the officers' words and actions following the

12

return of his driver's license and insurance card. <u>Cosby</u>, 231 Ill. 2d at 282. There was no evidence to indicate that Mr. Mendoza felt compelled to comply with the officer's request to search his car, especially in light of Mr. Mendoza's refusal to consent to the search. Therefore, "the subsequent discovery of the gun, the second stopping of Mendoza's car, and the officers' search of the car did not violate Mendoza's fourth amendment rights." <u>Cosby</u>, 231 Ill. 2d at 288.

In granting the motion to suppress in this case, the trial court ruled as follows:

"A review of the totality of the circumstances reveals that after the initial stop of the vehicle the officer lacked a reasonable articulable suspicion of any other illegal activity. The initial purpose of the traffic stop was satisfied, but the officer continued to detain and question the Defendant in violation of fourth amendment principals [<u>sic</u>]. Defendant's subsequent consent to search the vehicle was thus tainted as the product of that unlawful detention so as to render said consent invalid."

It is the return of the paperwork that signals the end of a traffic stop. <u>Cosby</u>, 231 Ill. 2d at 276. There is no mention in

13

the record that Mr. Ghaban received his license back.  The

officer did not issue a ticket at the scene.  Rather, Mr. Ghaban

was issued a ticket at the police station.[3]

We find the facts in the present case distinguish it from

the two consolidated cases in Cosby.  In both cases in Cosby, the

court determined that the initial lawful traffic stops had come

to an end prior to the requests to search.  The court rejected

the arguments based on the detention prong.  See Cosby, 231 Ill.

2d at 284, 286.  In the present case, the traffic stop had not

yet been completed prior to the request to search.  We do not

reach the question of whether a second seizure took place because

the initial seizure of the defendant had not been concluded at

the time Officer Tienstra made the request to search the minivan.

Unlike Cosby, the pivotal question in this case is whether the

officers' actions violated the duration prong by prolonging the

traffic stop beyond its lawful purpose.

There is no dispute that the stop of the minivan for routine

---

[3]Although Officer Tienstra issued a verbal warning as to the

cracked windshield, the record does not indicate clearly where

that verbal warning was issued.

14

No. 1-05-0599

traffic violations was lawful. Officer Tienstra asked and received a driver's license from Mr. Ghaban, the driver. When the officer questioned Mr. Ghaban as to why he was nervous, the driver responded with the perfectly plausible answer that it was the first time he had been stopped by the police. That should have ended the conversation, and the officer should have proceeded to issue the appropriate traffic citations. Instead, upon the arrival of Officer Beckwith, Officer Tienstra concentrated on questioning the defendant while Officer Beckwith detained Mr. Ghaban.

There is no evidence that either Officer Tienstra or Officer Beckworth ever returned Mr. Ghaban's driver's license to him. Morever, there is no evidence that Officer Beckwith issued the appropriate traffic citations to Mr. Ghaban while Officer Tienstra was questioning the defendant. In fact, the traffic citation was issued at the police station and only after the search of the minivan and the discovery of the contraband.

Like Cosby, Oliver involved a request to search after the traffic stop had ended. See Oliver, 236 Ill. 2d at 455 (it was undisputed that the traffic stop was a constitutionally permissible seizure, and the parties agreed that the initial

15

traffic-stop seizure ended before the police officer sought the consent to search).  The issue in Oliver was whether there was a second seizure.  In the present case there was no issue as to a second seizure because the traffic stop had not come to an end and therefore, the defendant was still "seized" when Officer Tienstra made the request to search.

We conclude that, like Cosby, Oliver is distinguishable on its facts and does not require a different result in this case.

While the initial seizure of the defendant in this case was lawful, it became unlawful when it was prolonged beyond the time reasonably required to complete its purpose, namely, to issue the appropriate traffic citations.  Long after the detention should have ended, Officer Tienstra continued to question the defendant during which time he consented to the search.  While contrary to the defendant's assertion, the trial court found that he consented to the search, and the court further found and, we agree, that the defendant's consent to search was tainted by the unlawful detention.

The State argues that Officer Tienstra's questioning of the defendant and the obtaining of his consent to search was proper under Muehler v. Mena, 544 U.S. 93, 161 L. Ed. 2d 299, 125 S. Ct.

No. 1-05-0599

1465 (2005), and Florida v. Bostick, 501 U.S. 429, 115 L. Ed. 2d 389, 111 S. Ct. 2382 (1991). While "mere police questioning does not constitute a seizure" (Bostick, 501 U.S. at 434, 115 L. Ed. 2d at 398, 111 S. Ct. at 2386), here, the defendant was already "seized" as a result of the traffic stop. In Muehler, the court held that the plaintiff was properly detained as she was on the premises subject to the search warrant. Questions as to her immigration status did not prolong her detention and, therefore, there was no additional seizure within the meaning of the fourth amendment. Muehler, 544 U.S. at 100-01, 161 L. Ed. 2d at 308-09, 125 S. Ct. at 1471-72. Moreover, in Muehler, the Court chose not to address Ms. Mena's alternative argument, pertinent to this case, that her detention extended beyond the time the police completed the tasks incident to the search, because the court of appeals had not addressed it. Muehler, 544 U.S. at 102, 161 L. Ed. 2d at 309, 125 S. Ct. at 1472. Under the facts of the present case, the officer's actions impermissibly prolonged the stop rendering the initial lawful seizure unlawful.

The State's reliance on Illinois v. Caballes, 543 U.S. 405, 160 L. Ed. 2d 842, 125 S. Ct. 834 (2005), is likewise misplaced. In Caballes, the United States Supreme Court held that a dog

17

No. 1-05-0599

sniff of a vehicle in the absence of a reasonable articulable suspicion of any other illegal activity did not change the character of the traffic stop that was lawful in its inception and otherwise conducted in a reasonable manner, unless the dog sniff itself infringed on the defendant's constitutionally protected interest in privacy. Caballes, 543 U.S. at 408, 160 L. Ed. 2d at 847, 125 S. Ct. at 837. The Court pointed out that as there is no legitimate interest in possessing contraband, governmental conduct that only reveals the possession of contraband "'compromises no legitimate privacy interest.'" Caballes, 543 U.S. at 408, 160 L. Ed. 2d at 847, 125 S. Ct. at 837, quoting United States v. Jacobsen, 466 U.S. 109, 123, 80 L. Ed. 2d 85, 101, 104 S. Ct. 1652, 1662 (1984).

The Court noted that a dog sniff is "sui generis," because it "'discloses only the presence or absence of narcotics, a contraband item.'" Caballes, 543 U.S. at 409, 160 L. Ed. 2d at 847, 125 S. Ct. at 838, quoting United States v. Place, 462 U.S. 696, 707, 77 L. Ed. 2d 110, 121, 103 S. Ct. 2637, 2644 (1983). The Court found that use of a dog sniff, which did not expose noncontraband items that would otherwise remain hidden from public view, during a lawful traffic stop, generally did not

18

implicate any legitimate privacy interests.  Where the dog sniff was performed on the exterior of the defendant's car while he was lawfully stopped for a traffic offense, it did not rise to the level of a constitutionally cognizable infringement.  Caballes, 543 U.S. at 409, 160 L. Ed. 2d at 847, 125 S. Ct. at 838.[4]

Caballes reaffirmed the survival of the duration prong of the Gonzalez analysis.  See Caballes, 543 U.S. at 407, 160 L. Ed. 2d at 846, 125 S. Ct. at 837 ("A seizure that is justified solely by the interest in issuing a warning ticket to the driver can become unlawful if it is prolonged beyond the time reasonably required to complete [the] mission").  The second principle stated in Caballes is that a police officer's actions do not change the character of a traffic stop that is lawful to begin with and otherwise executed in a reasonable manner unless the actions infringe upon the defendant's constitutionally protected interest in privacy.  Caballes, 543 U.S. at 408, 160 L. Ed. 2d at 846, 125 S. Ct. at 837; but see Harris, 228 Ill. 2d at 240 (while

[4]On remand, our supreme court held that the dog-sniff evidence was properly admitted at the defendant's trial.  People v. Caballes, 221 Ill. 2d 282, 336, 851 N.E.2d 26 (2006).

No. 1-05-0599

Caballes may be read to preserve some role for the "fundamental nature of the stop" prong of the Terry/Gonzalez inquiry, the court in Harris did not resolve that question because Muehler "unequivocally" overruled Gonzalez).[5]

Not only did Officer Tienstra's questioning of the defendant impermissibly prolong the detention, but under Caballes, his request to search the minivan also changed the fundamental nature of the traffic stop because it infringed upon the defendant's legitimate interest in privacy. In this case, the defendant was "seized" as a result of the traffic stop. Under Caballes, the search would have been proper if it had been limited to revealing only items of a contraband nature. Unlike the "dog sniff," which was conducted on the outside of the vehicle and which could only detect contraband, the search conducted in this case was not limited to revealing contraband items. The search was conducted

_____

[5]Nonetheless, the court in Harris concluded that a warrant check did not implicate any legitimate privacy interests because it did not reveal any legitimately private activity or information, or result in physical contact with a person or his property. Harris, 228 Ill. 2d at 237.

20

No. 1-05-0599

on the interior of the minivan where the defendant had a legitimate privacy interest in items of a noncontraband nature.

We conclude that the initial lawful seizure was rendered unlawful by the actions of the police officers in impermissibly prolonging the traffic stop and that the search of the minivan infringed upon the defendant's constitutionally protected privacy rights. The search violated the defendant's fourth amendment rights, and therefore, we affirm the granting of the defendant's motion to suppress.

Affirmed.

PATTI and LAMPKIN, JJ., concur.