2015 IL App (1st) 131145

THIRD DIVISION
September 16, 2015

No. 1-13-1145

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 10 CR 17785 |
| | ) | |
| CHARLES COLLINS, | ) | The Honorable |
| | ) | Carol A. Kipperman |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE LAVIN delivered the judgment of the court, with opinion.
Presiding Justice Pucinski concurred in the judgment and opinion.
Justice Hyman dissented in part, with opinion.

**OPINION**

¶ 1    Following a jury trial, defendant Charles Collins was found guilty of possession of a

controlled substance and possession of a controlled substance with intent to deliver, and was

sentenced as a habitual criminal to natural life in prison. On appeal, he asserts that the trial court

erred in denying his motion to quash arrest and suppress evidence procured as a result of a

warrantless search because he did not consent to the search and his mandatory supervised release

status (MSR) did not otherwise justify the search.[1]   Defendant also asserts that the Habitual

---

[1] In Illinois, parole has been replaced with MSR (730 ILCS 5/5-8-1(d) (West 2004)). *People v.
Moss*, 217 Ill. 2d 511, 514 n.1 (2005). Because there is no difference between a parolee and a

Criminal Act (730 ILCS 5/5-4.5-95(a) (West 2010)) is unconstitutional. In addition, both parties agree that defendant's conviction for possession of a controlled substance must be vacated as a lesser-included offense. We vacate that conviction and affirm the judgment in all other respects.

¶ 2                                    I. BACKGROUND

¶ 3                              A. Pretrial Proceedings

¶ 4      While on MSR, defendant was arrested after 809.8 grams of cocaine were found in the trunk of the car defendant was driving. He was subsequently charged with possession of a controlled substance and possession of a controlled substance with intent to deliver. Before trial, defendant filed a motion to quash arrest and suppress evidence. In support of defendant's motion, counsel argued that defendant knew cocaine was in the trunk and did not consent to a search of the car.

¶ 5      During the hearing on his motion, defendant testified that he was driving his girlfriend's blue Cadillac Eldorado when Officers Trevarthen and Clark[2] stopped him for alleged traffic violations. Defendant denied changing lanes without signaling and testified that he was not aware he had been speeding. When Officer Trevarthen asked defendant, who was unfamiliar with the area, for his route, defendant said he was driving from Elgin to Calumet Park, the latter being east of Elgin. Defendant explained that he exited the highway because his car was overheating. He did not say he was looking for a gas station, although he was, in fact, trying to get to a mechanic. In addition, defendant wanted to bypass some traffic on Interstate Route 290 (I-290) by driving west through Bellwood and re-entering I-290 in order to get on the Indiana Tollway, although that would mean traveling westbound instead of eastbound.

---

defendant on MSR when analyzing fourth amendment rights, we refer to MSR throughout this opinion.

[2] Although defendant did not know the officers' names, there is no dispute as to their identity.

¶ 6    Defendant further testified that Officer Trevarthen requested defendant's license and proof of insurance. Upon returning to the Cadillac, Officer Trevarthen also asked defendant if he was on MSR, to which defendant replied affirmatively. Officer Trevarthen then asked defendant to exit the car, but he said no. When asked again, defendant sought the reason for the request but Officer Trevarthen did not provide it and, instead, moved toward defendant's door handle. Defendant then agreed to exit the car, at which point Officer Trevarthen conducted a weapons pat down. In addition, Officer Trevarthen sought permission to search the car, but defendant, who knew that cocaine was in the trunk, said no. Defendant testified that if Officer Trevarthen had given him permission to leave, he would have done so. Furthermore, defendant testified that he could not recall signing his MSR agreement or agreeing to consent to searches per the agreement. Despite the lack of consent, Officer Trevarthen searched the vehicle, finding cocaine in the process. Defendant denied telling the police that he let them search the car because he was on MSR.

¶ 7    The State presented a somewhat different version of events. Officer Trevarthen, the State's only witness at this hearing, testified that he had been on duty with his partner, Officer Clark, wearing plainclothes and driving an unmarked car. After pulling defendant over, Officer Trevarthen asked him why he was traveling fast and "weaving in and out of traffic." Defendant responded that his car was overheating and he was trying to get to a gas station. This did not seem plausible, however, as defendant had passed two gas stations. Defendant proceeded to describe an implausible shortcut that involved traveling eight miles to avoid less than a mile of I-290. After taking defendant's license back to the police vehicle, Officer Trevarthen learned that defendant was on MSR. Officer Trevarthen also knew that people on MSR had to submit to a search by a police officer.

¶ 8    When Officer Trevarthen returned to defendant and asked him to exit his car, he complied without protest. In addition, Officer Trevarthen said he was going to conduct a pat-down search for weapons. He also asked defendant if he was on MSR, whether he had narcotics in the vehicle and whether Officer Trevarthen could search the vehicle, despite the officer's belief that defendant could not object. Furthermore, Officer Trevarthen told defendant he was free to leave but had not returned his license. Defendant also confirmed that he was on MSR based on a possession of cocaine conviction and consented to the search. Defendant also denied having drugs in his car, but Officer Trevathen opened the trunk and found approximately 809 grams of cocaine.

¶ 9    The State submitted a certified copy of defendant's MSR agreement, which states, "You shall consent to a search of your person, property, or residence under your control." The agreement also warned that violating the agreement may lead to revocation of MSR. Furthermore, defendant's signature appeared below an acknowledgment to having read and understood the contents of the agreement.

¶ 10    The trial court denied defendant's motion, finding, in pertinent part, that Officer Trevarthen's testimony was credible based on his demeanor and logic. After observing traffic violations and receiving illogical information from defendant, Officer Trevathen learned that defendant was on MSR. Officer Trevathen also knew that defendant had to allow such a search. Furthermore, the trial court expressly rejected defendant's contention that it was not logical to believe that defendant would have agreed to the search. The court found the officer's testimony that defendant consented was credible because defendant was on MSR and knew that the MSR agreement required him to allow a search.

¶ 11                                    B.   Trial

¶ 12    At trial, Officer Trevarthen's testimony substantially corroborated his testimony from the pretrial hearing. Officer Trevarthen added that after he relayed defendant's statements to Officer Clark and learned defendant was on MSR, a third officer, Officer Bresnehan, arrived and Officer Trevathen apprised him of the situation. In addition, Officer Trevarthen testified that he asked to search defendant's car due to MSR conditions and defendant's explanation for his conduct. Defendant ultimately told police that the cocaine was his. Defendant further stated that while he purchased the cocaine for $22,000, he could sell it for $30,000.

¶ 13    Officer Clark testified that before looking up defendant's information, Officer Trevathen said defendant's story "was not adding up." In addition, Officer Clark knew that defendant was on MSR prior to the search. Officer Clark also understood that MSR conditions prohibited defendants from refusing to consent to searches by law enforcement. After conducting a pat-down search of defendant at the rear of the Cadillac, Officer Trevarthen conversed with him regarding discrepancies in his story. Officer Clark also heard Officer Trevarthen ask for and receive permission to search defendant's car, but Officer Clark could not recall, or could not hear, whether Officer Trevarthen informed defendant he was free to leave. Had defendant not consented to a search, the two officers would have had to determine whether to inform defendant's MSR officer of defendant's refusal to submit to a search of the car or release him at the scene. Defendant ultimately admitted that the cocaine belonged to him and that he intended to sell it.

¶ 14    Officer Bresnehan testified that when he arrived at the scene, Officers Trevarthen and Clark explained why they stopped defendant, but Officer Bresnehan did not learn that defendant was on MSR until after the encounter. Officer Bresnehan also saw Officer Trevarthen speak with defendant, pat him down, and search the car, but Officer Bresnehan was not able to hear what

words were exchanged. Officer Bresnehan further testified, however, that he heard Officer Trevarthen ask for consent to search the vehicle, heard Officer Trevathen tell defendant he was free to leave and heard defendant consent.

¶ 15    In contrast to his pretrial strategy, defendant's strategy at trial was to disclaim ownership of the cocaine. Natoma Doss, defendant's girlfriend, testified that she lent him her Cadillac on the day of the incident but that other people had permission to use that car.

¶ 16    Following closing arguments, the jury found defendant guilty of possession of a controlled substance and possession of a controlled substance with intent to deliver.  The court subsequently sentenced defendant as a habitual criminal to natural life imprisonment, based on defendant's prior Class X convictions for delivery of a controlled substance (98 CR 14754; 98 CR 14758) and possession of a controlled substance with the intent to deliver (07 CR 00782). We note that defendant had several additional controlled substance convictions.

¶ 17                              II. ANALYSIS

¶ 18                    A. Motion to Quash Arrest and Suppress Evidence

¶ 19    On appeal, defendant first asserts that the trial court erred in denying his motion to quash arrest and suppress evidence because any consent was invalid due to the duration of the traffic stop. He also asserts the trial court's finding that he consented was manifestly erroneous. Defendant further contends that the search was otherwise unreasonable because the police lacked sufficient knowledge of the MSR condition requiring him to consent to a search.

¶ 20    Review of a motion to suppress evidence presents questions of both law and fact. *Moss*, 217 Ill. 2d at 517. If the findings of historical fact made by the trial court are not against the manifest weight of the evidence, they will be upheld by the reviewing court. *Id*. at 517-18. In addition, credibility determinations made by the trial court are given deference, because the trial

court is the better judge of the demeanor and credibility of witnesses based on their first-hand encounters. *People v. Roa*, 398 Ill. App. 3d 158, 166 (2010). The trial court is also in the best position to weigh conflicting testimony. *People v. Sorenson*, 196 Ill. 2d 425, 431 (2001). The ultimate question of whether the evidence in question must be suppressed, however, is reviewed *de novo*, with the facts viewed in light of the issues presented. *Moss*, 217 Ill. 2d at 518. When reviewing a trial court's determination on a motion to quash an arrest and suppress evidence, we are entitled to consider not only the evidence presented at the hearing on the motion, but evidence presented at trial as well. *People v. Rivas*, 302 Ill. App. 3d 421, 437 (1998).

¶ 21    The fourth amendment of the United States Constitution protects the rights of individuals "against unreasonable searches and seizures." U.S. Const., amend. IV. Reasonableness is the touchstone of fourth amendment analysis and presents an objective standard, determined by examining the totality of the circumstances. *Ohio v. Robinette*, 519 U.S. 33, 39 (1996). To meet the standard of legality in a search and seizure case, generally, a warrant supported by probable cause is required. *Moss*, 217 Ill. 2d at 518. Limited investigative stops are permitted, however, where probable cause is lacking but a reasonable suspicion exists, based on articulable facts, that the person has or is about to commit a criminal offense. *People v. Jones*, 215 Ill. 2d 261, 270 (2005) (citing *Terry v. Ohio*, 392 U.S. 1, 21-22 (1968)).

¶ 22    Because temporary detention during a traffic stop is in effect a seizure of the occupant, the reasonableness requirements as to whether the search was within the permissible scope of the stop are guided by the principles elaborated in *Terry*. *People v. Bunch*, 207 Ill. 2d 7, 13-14 (2003). When the officer's actions are justified at their inception, the inquiry turns to whether the following search was " 'reasonably related in scope to the circumstances which justified the interference in the first place.' " *People v. Lampitok*, 207 Ill. 2d 231, 241 (2003) (quoting *Terry*,

7

392 U.S. at 20). In addition, where responses to an officer's inquiries arouse further suspicion, an officer may prolong a traffic stop and expand the scope of his inquiry. *People v. Shinohara*, 375 Ill. App. 3d 85, 96 (2007). Similarly, officers are entitled to make unrelated inquiries so long as in doing so, they do not unreasonably prolong the stop. *People v. Pulling*, 2015 IL App (3d) 140516, ¶ 17. Furthermore, consent presents an exception to the warrant requirement. *People v. Harris*, 2015 IL App (4th) 140696, ¶ 45.

¶ 23     We note that defendant does not dispute the initial vehicle stop was valid based on Officer Trevarthen's observation of the traffic violations. See *Moss*, 217 Ill. 2d at 527. Defendant also concedes that the pat-down search for the officers' safety was reasonable. Instead, defendant argues that the stop was unreasonably long and as a result, turned a justified stop into an invalid seizure, rendering any subsequent consent invalid.

¶ 24     The evidence presented at the motion to suppress hearing did not show that any conduct of the officers unreasonably prolonged the encounter. In addition, the trial court reasonably accepted Officer Trevarthen's testimony that he found defendant's explanation of his route illogical, creating additional suspicion. Having learned that defendant was on MSR for a possession of cocaine conviction, it was reasonable for Officer Trevarthen to ask whether defendant had narcotics in the car. Officer Trevarthen's inquiries, including his request for consent to search, did not themselves prolong the stop in any material way. Furthermore, because a person's agreement to wait during a consensual search is inherent in his consent, the duration of the search does not change the result. *People v. Oliver*, 236 Ill. 2d 448, 458 (2010).

¶ 25     We are unpersuaded by defendant's reliance on *People v. Al Burei,* 404 Ill. App. 3d 558 (2010), where this court affirmed the trial court's suppression of evidence. There, the driver and the defendant passenger were seized in a lawful traffic stop. *Id*. at 565-66. The reviewing court

found that when the driver provided a plausible explanation for being nervous, the police should have issued the appropriate citation and concluded the encounter. *Id*. at 565. Instead, the police detained the driver and his driver's license while the defendant passenger was questioned, long after the detention should have ended. *Id*. at 565-66. The reviewing court found that the defendant passenger's subsequent consent to search was tainted by the unlawful detention. *Id*. at 566.

¶ 26    Unlike *Al Burei*, here, defendant was the driver and, pursuant to the trial court's findings, provided an implausible explanation for what he was doing.  In addition, while the defendant in *Al Burei* was not on MSR, defendant was. See *Samson v. California*, 547 U.S. 843, 853 (2006). Notwithstanding the factual differences between *Al Burei* and the present case, our deference to the trial court's findings is the same.  Accordingly, we affirm the trial court's denial of defendant's motion, just as the reviewing court in *Al Burei* affirmed the trial court's judgment granting the defendant's motion.

¶ 27    Moreover, the record supports the trial court's finding that defendant consented to the search.  Officer Trevarthen testified that defendant consented to the search, notwithstanding defendant's testimony to the contrary. In addition, Officer Clark and Officer Bresnehan testified at trial that they heard Officer Trevarthen ask for and receive consent.  As defendant acknowledges, the trial court found Officer Trevarthen to be credible. Although defendant argues Officer Trevarthen's testimony was incredible because he asked for consent while telling defendant he was free to leave, the trial court was not required to make that credibility determination.

¶ 28    We also reject defendant's contention that Officer Trevarthen's testimony was incredible because it defies logic that defendant would have consented to the search of a car he knew

contained over 800 grams of cocaine. The trial court was entitled to find from the MSR agreement signed by defendant that he knew he was required to consent or face an MSR violation, despite defendant's testimony denying such knowledge. See 730 ILCS 5/3-3-7 (West 2010); *People v. Wilson*, 228 Ill. 2d 35, 48-49 (2008) (observing that a defendant on MSR risks the potential revocation of MSR by failing to comply with officers' search requests). In addition, defendant may have hoped that consenting would allay any suspicion, leading the officer to ultimately forgo the search. Officer Trevarthen's testimony regarding defendant's consent did not rise to the level of being contrary to human experience. *Cf. People v. Dawson*, 22 Ill. 2d 260, 265 (1961) (finding it contrary to human experience that a perpetrator of armed robbery would immediately return most of the money stolen and return to the scene for a drink); *People v. Coulson*, 13 Ill. 2d 290, 296 (1958) (finding the victim's testimony that five men took his wallet but voluntarily escorted him home and waited outside while he alone searched for more money "taxes the gullibility of the credulous"). We further note that defendant's decision to knowingly carry over 800 grams of cocaine, despite having agreed to consent to searches via his MSR agreement, was far less logical than Officer Trevarthen's testimony.

¶ 29    Even assuming defendant did not consent to the search, we would nonetheless affirm the trial court's determination. Defendant correctly states that the search condition found in a defendant's MSR agreement does not constitute prospective consent. *Wilson*, 228 Ill. 2d at 39. In addition, defendants on MSR are not equated with prisoners, who have no fourth amendment rights. *Id*. at 44 (citing *Samson*, 547 U.S. at 850 n.2). With that said, the circumstances of a defendant on MSR, including the requirement to permit searches, mean that such individuals lack an expectation of privacy that society recognizes as legitimate. *Id*. at 44-45 (quoting *Samson*, 547 U.S. at 852). Accordingly, "[t]he Fourth Amendment does not prohibit a police

officer from conducting a suspicionless search of a parolee." *Id.* at 52 (quoting *Samson*, 547 U.S. at 857); see also *People v. Kornegay*, 2014 IL App (1st) 122573, ¶ 48 (finding that the defendant's MSR agreement reduced his expectation of privacy in his home "to a level that society would not recognize as legitimate"); *People v. Jordan*, 2011 IL App (4th) 100629, ¶¶ 15, 26 (the reviewing court assumed that a search was permissible under the driver's MSR agreement and *Wilson* but found that evidence recovered later was properly suppressed due to a *Miranda* violation (citing *Miranda v. Arizona*, 384 U.S. 436 (1966))).

¶ 30    Additionally, defendant's attempts to distinguish the particular facts leading to the search in *Wilson* from the facts leading to the search in the present case is misplaced, as *Samson* and *Wilson* essentially demonstrate that an officer's knowledge that the defendant was on MSR in and of itself renders a suspicionless search reasonable. See also *Moss*, 217 Ill. 2d at 532-33 (holding prior to *Samson* and *Wilson* that the "vulnerable position of the officers, the trooper's concerns about the histories of the men who were pulled over, the defendant's MSR status, and his significantly reduced expectation of privacy" made a pat-down search reasonable). Furthermore, both defendant and Officer Trevarthen testified that the officer knew prior to the search that defendant was on MSR. *Cf. People v. Coleman*, 2013 IL App (1st) 130030, ¶ 21 (finding that an unlawful search cannot be justified on the basis that the vehicle's operator was on MSR where the officer learns that fact only after the search); see also *Jordan*, 2011 IL App (4th) 100629, ¶¶ 7, 15 (the reviewing court assumed that a search was permissible under the driver's MSR agreement and *Wilson* even though the officer nonetheless asked for consent). We decline defendant's invitation to impose a more stringent requirement on police officers. See *United States v. Williams*, 702 F. Supp. 2d 1021, 1030 (N.D. Ill. 2010) (requiring officers to have knowledge that the defendant's particular MSR agreement contained a search condition, and

noting that the officers did not know whether the defendant was on MSR from a different state that had a search condition or whether the condition, albeit required, was nonetheless omitted); see also *People v. Neese*, 2015 IL App (2d) 140368, ¶ 21 (observing that federal district court cases are not binding). Accordingly, the trial court properly denied defendant's motion to quash arrest and suppress evidence.

¶ 31                                    B. Habitual Criminal Act

¶ 32    Next, defendant asserts that the Habitual Criminal Act (730 ILCS 5/5-4.5-95(a) (West 2010)) violates the proportionate penalties clause of the Illinois Constitution (Ill. Const., art. I, § 11) as well as the eighth amendment to the United States Constitution (U.S. Const., amend. VIII) as applied because it requires him to spend the remainder of his life in prison without the possibility of MSR, after being convicted of possession of a controlled substance with the intent to deliver, a nonviolent offense. We review the constitutionality of a statute *de novo*. *People v. Gipson*, 2015 IL App (1st) 122451, ¶ 50.

¶ 33    "Every person who has been twice convicted in any state or federal court of an offense that contains the same elements as an offense now *** classified in Illinois as a Class X felony, *** and who is thereafter convicted of a Class X felony, *** committed after the 2 prior convictions, shall be adjudged an habitual criminal." 730 ILCS 5/5-4.5-95(a)(1) (West 2010). In addition, "anyone adjudged an habitual criminal shall be sentenced to a term of natural life imprisonment." 730 ILCS 5/5-4.5-95(a)(5) (West 2010).

¶ 34    Recently, we upheld this statute in the face of challenges under the proportionate penalties clause and the eighth amendment. *People v. Fernandez*, 2014 IL App (1st) 120508, ¶¶ 38, 43. In *Fernandez*, the defendant was sentenced as an habitual criminal to natural life in prison where he was convicted of delivering 1,008.5 grams of cocaine, having already been

twice convicted of qualifying controlled substance offenses. *Id.* ¶ 1. We recognized that the sentence was harsh. *Id.* ¶ 2. We acknowledged that a mandatory natural life sentence for a nonviolent offender who had only three felony controlled substance convictions was "extremely harsh punishment." Nonetheless, we were compelled to find pursuant to United States Supreme Court precedent (*Harmelin v. Michigan*, 501 U.S. 957 (1991)) that his sentence did not violate the eighth amendment. *Fernandez*, 2014 IL App (1st) 120508, ¶¶ 39-40. We note that here, defendant too acknowledges that the Court's precedent weighs against his claim. In addition, we held in *Fernandez* that Illinois precedent, in conjunction with persuasive United States Supreme Court precedent interpreting the eighth amendment, did not support finding a proportionate penalties clause violation. *Id.* ¶¶ 49, 64.

¶ 35    Having considered the parties' contentions, we find no reason to depart from *Fernandez*. We agree that imposing a mandatory life sentence on a nonviolent offender is harsh and we question the wisdom of the legislature in this regard. Nonetheless, we cannot say any imprudence on the legislature's part amounts to a constitutional violation. In reaching this decision, we note that *Miller v. Alabama*, 567 U.S. __, 132 S. Ct. 2455 (2012), provides defendant with no support, as there, the Court held that the eight amendment prohibits sentencing schemes that mandate the imposition of life-without-parole sentences on *juveniles*. In contrast, defendant was over 30 years old when he committed the present offense. Accordingly, we need not consider this contention further.

¶ 36                              C. Lesser-Included Offense

¶ 37    Finally, defendant asserts that his conviction for possession of a controlled substance must be vacated because it is lesser-included offense of possession of a controlled substance with

13

intent to deliver. *People v. Coleman*, 391 Ill. App. 3d 963, 976 (2009). The State agrees, as do we.

¶ 38                                    III. CONCLUSION

¶ 39     In conclusion, the trial court properly denied defendant's motion to quash arrest and suppress evidence and defendant cannot demonstrate that his sentence is unconstitutional. Defendant's conviction for possession of a controlled substance, however, is a lesser-included offense of possession with intent to deliver.

¶ 40     For the foregoing reasons, we vacate defendant's possession of a controlled substance conviction and affirm the judgment in all other respects.

¶ 41     Affirmed in part and vacated in part.

¶ 42     JUSTICE HYMAN, dissenting in part.

¶ 43     So fundamental is the principle of proportionality between crime and punishment that the 1970 Illinois Constitution enshrines it in article I, section 11. Ill. Const. 1970, art I., § 11. This provision protects individuals from disproportionate sentences and requires all penalties be determined based on the seriousness of the offense and with the objective of rehabilitating the offender to a useful citizen. (Term "proportionality clause" as used here refers to both clauses, proportionate penalties and rehabilitation). Yet, in cases that cry out for something less than the maximum sentence, the proportionality clause has been of little value in limiting enforcement of the Habitual Criminal Act (730 ILCS 5/5-4.5-95(a) (West 2010)). For Charles Collins, life without parole  is so disproportionate to the offense that it shocks the moral sense of the community and violates the proportionality clause.  Therefore, I respectfully dissent from the portion of the opinion rejecting Collins's challenge.

¶ 44     I believe the application of the Habitual Criminal Act in *People v. Fernandez*, 2014 IL App (1st) 120508 is wrong, and should not be followed, especially, as realized by the majority and the court in *Fernandez*, mandatory natural life for an offender with three felony drug convictions results in harsh and extreme confinement. *Supra ¶* 35 ("imposing a mandatory life sentence on a nonviolent offender is harsh and we question the wisdom of the legislature in this regard"); *Fernandez*, 2014 IL App (1st) 120508, ¶ 43 (sentence of natural life without parole for "offender with only three felony drug convictions" is "extremely harsh punishment").

¶ 45     Equally significant, the court in *Fernandez* could not locate any Illinois decision addressing mandatory life imprisonment under the Habitual Criminal Act for nonviolent offenses and found that the issue was one of first impression. *Id. ¶* 48. This alone should strike a chord—a life sentence for nonviolent offenses barely exists, and if it barely exists, that should be a tell that something might be amiss. The "something," as our supreme court has observed, is that the Habitual Criminal Act applies to "criminal defendants who have demonstrated a propensity to commit *violent* crimes." (Emphasis added.) *People v. Dunigan*, 165 Ill. 2d 235, 243 (1995) (emphasis added).

¶ 46     According to a study by the American Civil Liberties Union as of 2012, only 10 of 1,600 prisoners in Illinois with nonviolent offenses were serving natural life without the possibility of parole. See *Fernandez*, 2014 IL App (1st) 120508, ¶ 48 n. 2 (citing American Civil Liberties Union, A Living Death: Life Without Parole for Nonviolent Offenses 22 (2013), http://www.aclu.org/files/assets/111813-1wop-complete-report.pdf). Whether one offender, 10 offenders or 10 times 10 offenders, these nonviolent individuals, which includes Collins, received the most severe, most onerous sentence possible, the same sentence imposed on a thrice-convicted ruthless murderer.

¶ 47    This one-size-fits-all approach does not always square with the nature and details of an offender's history, convictions, including the absence of a victim or violence, and potential for rehabilitation. As for Collins, he was sentenced to die in prison, with no possibility of parole, despite being convicted of only drug crimes, all for delivery and possession with intent to deliver, in 1998, 2007, and again in 2012. Nothing indicates that Collins armed himself with a weapon when he committed any of the three drug offenses. Imposing the harshest of all sentences on Collins is categorically disproportionate to the particulars of the offender and the offenses.

¶ 48    The General Assembly cannot take away rights granted by the Illinois Constitution without changing the Constitution.  Although the legislature may prescribe mandatory sentences, "the penalty must satisfy constitutional constrictions." *People v. Miller*, 202 Ill. 2d 328, 336 (2002) (statute imposing mandatory life sentence on juvenile who served as lookout to double murder unconstitutional as applied to him). The Illinois Supreme Court has refused to define what constitutes "so wholly disproportioned to the offense as to shock the moral sense of the community," explaining that "as our society evolves, so too do our concepts of elemental decency and fairness which shape the 'moral sense' of the community." (Internal quotation marks omitted.) *Id.* at 339. And, as this is an as-applied constitutional challenge, awarding Collins relief does not require overruling any Illinois Supreme Court precedent.  *Id.* at 335-37 (presented as-applied challenge).

¶ 49    The majority in following *Fernandez* fails to adhere to the purpose of the Habitual Criminal Act, which even the State acknowledges, is to "punish *violent* recidivist offenders." (emphasis added.) The presence of violence as justification for the Habitual Criminal Act has long been recognized by this court: "[t]he Act 'is a constitutional exercise of this State's police power to protect our society from *habitually violent and heinous criminals*.' " (Emphasis added.) *People v.*

*Cummings*, 351 Ill. App. 3d 343, 348 (2004) (quoting *People v. McNeil*, 125 Ill. App. 3d 876, 884 (1984)).

¶ 50    The cases the State cites in its brief perfectly illustrate the intent of the Habitual Criminal Act to apply to crimes involving violence and extreme brutality, not to nonviolent offenses or offenders. These cases, except one, involve violence and brutality and almost all involve a weapon. See *Cummings*, 351 Ill. App. 3d at 344; *McNeil*, 125 Ill. App. 3d 878; *People v. Bryant*, 278 Ill. App. 3d 578, 580 (1996); *People v. Robinson*, 268 Ill. App. 3d 1019, 1021 (1994); *People v. Gaston*, 259 Ill. App. 3d 869, 870 (1994); *People v. Wilson*, 257 Ill. App. 3d 826, 827 (1994); *People v. McCall*, 190 Ill. App. 3d 483, 484 (1989); *People v. Morissette*, 150 Ill. App. 3d 431, 433 (1986); *People v. Withers*, 115 Ill. App. 3d 1077, 1078 (1983). See also, *People v. Franzen*, 183 Ill. App. 3d 1051, 1053 (1989) (aggravated criminal sexual assault); *People v. Hartfield*, 137 Ill. App. 3d 679, 682 (1985) (rape).

¶ 51    The lone exception, with no violence and no weapons, happens to be *Fernandez.*

¶ 52    Our evolving standards of decency in Illinois include the State's abandonment of the death penalty as a form of retributive punishment. But, a life of captivity carries many of the same characteristics as a sentence of death, according to no less an authority than the United States Supreme Court:

> "[L]ife without parole is 'the second most severe penalty permitted by law.' [Citation.] It is true that a death sentence is 'unique in its severity and irrevocability,' [citation]; yet life without parole sentences share some characteristics with death sentences that are shared by no other sentences. The State does not execute the offender sentenced to life without parole, but the sentence alters the offender's life by a forfeiture that is irrevocable. It deprives the convict of the most basic liberties without giving hope

17

of restoration, except perhaps by executive clemency–the remote possibility of which does not mitigate the harshness of the sentence." *Graham v. Florida*, 560 U.S. 48, 69-70 (2012).

¶ 53    Convicted criminals and criminal law experts have said much the same thing. Typical is this description from a convicted murderer who preferred to be put to death than live out his days locked behind bars. " Life without parole, " he told a reporter, " is like putting me in a room with a tiger and letting him take bite after bite out of me, a little at a time. " Dwayne Bray, Thorton Says He Is Sorry for Slaying, Los Angeles Times (Mar. 23, 1995), http://articles.latimes.com/1995-03-23/local/me-46116_1_extreme-accident. In a similar vein, an executive director of a death penalty advocacy group once said, " One could argue that life in prison is the worst kind of punishment and not the death penalty. " Bryan Robinson, Death-Row Inmates Prefer Death to Life, abc News (Jan. 7, 2015), http://abcnews.go.com/US/story?id=90935&page=1&singlePage=true. Also, not to be overlooked is the fact that an overwhelming number of prisoners serving a life sentence are black or Hispanic and poor. Studies show that defendants of color are more likely to receive life sentences for nonviolent drug offenses. See, *e.g*., United States Sentencing Commission, Life Sentences in the Federal System (Feb. 2015), http://clemencyreport.org/wp-content/uploads/2015/02/Federal-Life_ Sentences-report-USSC.pdf.

¶ 54    Finally, the sentencing judge noted that the Habitual Criminal Act deprived Collins of a more appropriate sentence: "Based upon his record, this is a mandatory case. If it weren't I—I am sure that there was—this [*sic*] is a sentence in here which could have been suitable, but it is mandatory."

¶ 55     To be considered unconstitutionally disproportionate, courts in Illinois have ruled that the punishment must be cruel, degrading, or so wholly disproportionate to the offense as to shock the moral sense of the community. *People v. Sharpe*, 216 Ill. 2d 481, 521 (2005); *People v. Lombardi*, 184 Ill. 2d 462, 473-74 (1998). Despite the unsettling result in *Fernandez*, the court conceded that the "case shows the distorting effect of mandatory life sentences without the possibility of parole." *Fernande*, 2014 IL App (1st) 120508, ¶¶ 53. It is this "distorting effect," as applied to Collins, that shocks the moral sense of the community, warranting remand for a new sentencing hearing at which a sentence of life imprisonment is not mandatory.

¶ 56     Sentencing for nonviolent drug crimes has been evolving. Under the federal sentencing statutes, Collins's current offense would not mandate life imprisonment. 21 U.S.C. § 841 (2006). And, California's "three strikes law" no longer requires life in prison if the third offense is a drug conviction. Cal. Penal Code § 1192.7(c) (West YEAR) (defining "serious" felonies).

¶ 57     The Habitual Criminal Act punishes violent, recidivist offenders. *People v. Dunigan*, 165 Ill. 2d 235, 246 (1995) ("[t]he legislature obviously considered the seriousness of the offense when it enacted the Act, which applies only to Class X felonies, first degree murder and criminal sexual assault, offenses recognized to be particularly violent and dangerous to society"); accord *People v. Glover*, 173 Ill. App. 3d 678, 684 (1988) ("Under the Illinois statute the defendant must be sentenced to life imprisonment if he has committed three Class X felonies, and Class X felonies involve the use of force or threat of force."). By relegating the pertinent facts to the status of background, the Habitual Criminal Act undermines its own attempt to justify natural life for the most violent crimes and offenders. See *Miller*, 202 Ill. 2d at 342-43 ("A life sentence without the possibility of parole implies that under any circumstances a *** defendant *** is incorrigible and incapable of rehabilitation for the rest of his [or her] life.").

19

¶ 58    Collins does not belong to the type of violent recidivist whom the Act intended to lock away for good. The crime for which he was convicted did not involve murder, violence, or guns; yet, he received the harshest and most extreme penalty available in Illinois, the same sentence imposed on those whose crimes demonstrate evil at its most frightening. To let Collins's sentence stand diminishes the very constitutional protections the courts are charged with enforcing and jeopardizes the rights of all of us. Whenever the rights of one individual have been invaded, the rights of all are in danger.

¶ 59    The hope and promise of justice depends on the courts intervening in their role as guardian of constitutional rights when, as here, one of those rights has been breached.