NOTICE
This order was filed under Supreme
Court Rule 23 and may not be cited
as precedent by any party except in
the limited circumstances allowed
under Rule 23(e)(1).

2020 IL App (4th) 180098-U

NO. 4-18-0098

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
September 2, 2020
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Sangamon County |
| STEPHEN C. COLEMAN, | ) | No. 15CF1036 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | John M. Madonia, |
| | ) | Judge Presiding. |

JUSTICE HARRIS delivered the judgment of the court.
Presiding Justice Steigmann and Justice DeArmond concurred in the judgment.

**ORDER**

¶ 1    *Held*: Defendant forfeited his claim that the trial court erred by denying his motion to suppress evidence based on an unlawfully prolonged traffic stop and failed to establish the occurrence of plain error.

¶ 2    Following a bench trial, defendant, Stephen C. Coleman, was found guilty of unlawful possession of a weapon by a felon (720 ILCS 5/24-1.1(a) (West 2014)), being an armed habitual criminal (*id.* § 24-1.7(a)), and aggravated unlawful use of a weapon (*id.* § 24-1.6(a)(1), (a)(3)(C)). After finding the three offenses merged, the trial court sentenced defendant to 15 years in prison for being an armed habitual criminal. Defendant appeals, arguing the court erred by denying his pretrial motion to suppress evidence that was discovered by the police following an unlawfully prolonged traffic stop. We affirm.

¶ 3    I. BACKGROUND

¶ 4        In October 2015, defendant was the sole passenger of a vehicle owned and operated by Trish Rennier. During a traffic stop, the police searched the vehicle and located a handgun under the front passenger seat. They also conducted a "pat down" of defendant's person and found he was wearing a bullet proof vest under his clothing. As a result of that incident, defendant was arrested, and the State charged him with unlawful possession of a weapon by a felon (*id.* § 24-1.1(a)) (count I), being an armed habitual criminal (*id.* § 24-1.7(a)) (count II), and aggravated unlawful use of a weapon (*id.* § 24-1.6(a)(1), (a)(3)(C)) (count III). The State alleged defendant, who had not been issued a valid Firearm Owner's Identification card, knowingly possessed and carried a firearm while wearing body armor and after having been previously convicted of certain specified felony offenses.

¶ 5        In May 2016, defendant filed a "Motion To Suppress Evidence And Quash Arrest." He alleged Rennier's vehicle was improperly searched during the traffic stop. He also asserted that the purpose of the stop was "to issue a traffic citation" and "[t]he time of the stop far exceeded what would be considered an appropriate time for that purpose." Defendant asked the court to suppress all evidence obtained from the allegedly improper search.

¶ 6        In June 2016, the trial court conducted a hearing on defendant's motion. Defendant presented Rennier as a witness. Rennier testified she was friends with defendant and on the day of the October 2015 traffic stop, she picked defendant up in her car and the two went "driving around." She denied noticing "anything unusual" about defendant when he got into her car or as they were driving. At some point, Rennier's car was stopped by the police. Rennier recalled seeing two police officers. She denied that the officers told her why her vehicle was stopped. She stated the police officers asked for her "information" and she provided them with her driver's license and her proof of insurance. She believed they also asked defendant for his "information," but she was

not sure if defendant provided anything to the officers.

¶ 7 According to Rennier, after the police officers received and "ran" her information, they asked both her and defendant to step out of the car. Rennier stated she was searched by the police. Although she did not recall giving the police officers permission to search her person, she "imagine[d]" that she did. Rennier stated she did not hear any interaction between the officers and defendant. She also did not remember the police officers asking for permission to search her car. Nevertheless, the car was searched, and the officers reported to Rennier that defendant "had a vest on and a gun under his seat." Rennier told the police she did not know where the gun came from, she did not know it was there, and she did not know to whom it belonged. She testified she had been in the car for about 30 minutes before the traffic stop and never saw a gun. Finally, Rennier testified she was not issued a traffic citation as a result of the stop.

¶ 8 On cross-examination, Rennier admitted she and defendant were closer than just friends and the two had a "romantic relationship." She clarified that she did not remember whether the police officers asked for permission to search her person or her car. Rennier reiterated that while in the car prior to the traffic stop, she never saw a gun or defendant "with his hands on a gun." When questioned about defendant's reaction when her vehicle was being pulled over, Rennier testified as follows: "[W]hen we got pulled over I had *** a bottle of liquor, so I was trying to hand it to him. *** I ended up just sticking it under my seat. And he said something about not being able to go down for this charge." Rennier stated she did not know what defendant was talking about. Also, she testified she was "more focused on" herself and hiding the liquor bottle and did not see what defendant was doing.

¶ 9 Rennier additionally testified that the car she and defendant were in when stopped by the police belonged to her. Defendant had no financial or ownership interest in the vehicle and

did not regularly drive it.

¶ 10    Following Rennier's testimony, defendant rested. The State moved for a directed finding, arguing defendant failed to establish that he had "a legitimate privacy interest in" Rennier's vehicle and, thus, lacked standing to move for suppression based on an improper search of that vehicle. Ultimately, the trial court agreed with the State and found defendant did not have standing to challenge the vehicle search. However, based upon defense counsel's assertion that defendant had a reasonable expectation of privacy "on his person" and his assertion that no evidence showed he consented to a pat down, the court found defendant had shifted the burden to the State regarding whether the search of his person, resulting in the discovery of body armor beneath his clothing, was valid.

¶ 11    The State then called Matthew Dowis, a police officer for the City of Springfield, as a witness. Dowis testified that on the date of the traffic stop, he was on patrol with another officer, Rikki Castles, when they observed a red Ford Fusion make "a very close sharp turn" toward their vehicle and into their lane of travel, *i.e.*, into the opposite direction of traffic for the Ford Fusion. According to Dowis, the driver of the Ford Fusion had to "cut really hard back into their lane *** to avoid hitting" the police vehicle. As a result, a traffic stop was initiated. Dowis testified he approached the passenger side of the stopped vehicle while Castles approached the driver's side. Dowis requested and documented the passenger's name and date of birth. He identified defendant as the passenger of the vehicle.

¶ 12    Dowis testified that the area where the traffic stop occurred was "a known drug area." Based on both "the time [of the stop] and the area," the officers "ran" the "names" and "criminal histories" of both the vehicle's driver and defendant. He stated he learned that defendant "had a known drug history *** and also weapons offenses." When the officers approached the

- 4 -

vehicle the second time, Castles asked the driver, whom they identified as Rennier, if they could search the car. According to Dowis, Rennier gave verbal consent for a search.

¶ 13     After obtaining Rennier's consent for the vehicle search, Dowis asked defendant to step out of the vehicle. Once defendant exited the car, Dowis asked if he could "pat him down for weapons" and defendant consented. Dowis testified he conducted the pat down "based on the area and also based on [defendant's] past history." He also testified that was what he did with every person anytime he had them exit a vehicle. During the pat down, Dowis checked "the exterior of [defendant's] clothing just to see if he had any unusual bulges in his clothing, his waistline, anything like that." Dowis felt "an uncommon feature underneath [defendant's] shirt," which defendant stated "was a bullet proof vest." Defendant reported that he had been receiving threats and was wearing the vest for protection. Ultimately, Dowis and Castles searched Rennier's vehicle and discovered a loaded "9-millimeter Taurus handgun" underneath the passenger seat. After the gun was found, defendant was placed in handcuffs.

¶ 14     On cross-examination, Dowis testified that during the traffic stop, he did not notice any "alarming" behavior from either Rennier or defendant. He described defendant as cooperative and stated he did not appear nervous. Dowis, however, would not agree that there was "no officer safety issue" at the time of the "first approach" to Rennier's vehicle, noting the officers "didn't know who the individuals were in the vehicle." Dowis further testified that it took "30 seconds to a minute" to check the information he and Castles received from Rennier and defendant and that their second approach to the vehicle occurred within two to three minutes. The officers "ran" Rennier's information first and then defendant's information. According to Dowis, "[a]t that point *** [they] made the decision *** to ask to search the car." He acknowledged that the "sole reason" he and Castles asked to search the car was due to defendant's prior record. The reason defendant

was asked to exit the vehicle was because Rennier gave her consent for a search. Dowis stated the officers could not search the vehicle if defendant remained inside.

¶ 15　　　　Following Dowis's testimony, the State rested. The trial court then denied defendant's motion to suppress. It reiterated its finding that defendant lacked standing to challenge the search of the vehicle. Additionally, it denied defendant's challenge to the pat down conducted by Dowis, finding both that defendant consented to the pat down and that, under the totality of the circumstances, "the officers possessed a reasonable basis for officer safety reasons to conduct a quick pat down."

¶ 16　　　　Following the trial court's ruling on his motion to suppress, defendant requested leave to file a *pro se* motion to reconsider the court's previous ruling. In July 2016, the trial court granted him leave over the State's objection that defendant was represented by counsel and should not be allowed "hybrid representation." In his *pro se* motion, defendant argued the search of the Rennier's vehicle was improper because it was conducted without a warrant. He also maintained that there had been no consent for either a search of the vehicle or his person and that the police had "no right to further detain the vehicle to do an exploratory search." Ultimately, the court denied the motion, reiterating its findings that defendant lacked "standing to object to what was found in the car" and that he "validly consented" to a search of his person at a time when the officers "had reason to ask [defendant] to exit [the] vehicle."

¶ 17　　　　In September 2016, the trial court granted defendant's motion to substitute his appointed counsel for legal representation of his own choosing and his new counsel entered an appearance. In February 2017, defendant, with the aid of his new counsel, filed a series of motions to suppress both statements and evidence in the case. Defendant argued there had been no probable cause for the police to detain, arrest, and search him; the duration of the police officers' detention

of both defendant and the vehicle was impermissibly prolonged beyond the "time reasonably required to complete the traffic stop"; and his arrest "was illegal."

¶ 18	In March 2017, the State filed a motion to strike defendant's February 2017 motions to suppress, alleging, in part, that they sought suppression of the same evidence and raised the same issues as his original motion to suppress, which was addressed by the trial court and denied. The same month, the court granted a motion to withdraw by defendant's attorney and reappointed the public defender's office to represent him. Defendant was thereafter represented by his original appointed attorney in the case, who declined to adopt the previous counsel's February 2017 motions to suppress.

¶ 19	Again, in May 2017, defendant obtained new counsel who entered his appearance in the case. During a hearing in August 2017, defense counsel argued that in connection with defendant's original motion to suppress evidence, an issue had been raised regarding the lack of probable cause for the October 2015 traffic stop, which had not been addressed by the trial court in its ruling. Ultimately, the court allowed defendant the opportunity to file a new motion to suppress evidence raising that issue.

¶ 20	In September 2017, defendant filed a new motion to suppress evidence, arguing the police had no reasonable suspicion that a traffic violation had occurred prior to the underlying stop and, as a result, any subsequently seized evidence should be suppressed. Further, defendant maintained that as a passenger of Rennier's vehicle, he had standing to challenge the traffic stop as illegal. The State filed a response, asking the trial court to strike defendant's successive motion because he was attempting to "resurrect an argument that he previously raised and abandoned."

¶ 21	The same month, the trial court conducted a hearing and elected to allow defendant to proceed on his motion. During the hearing, the court clarified that the only issue before it

concerned whether the police had a reasonable suspicion that a traffic violation had occurred before the stop. Again, defendant called Rennier as a witness. Rennier's testimony was substantially similar to her testimony at the prior hearing. She acknowledged picking defendant up on the day of the traffic stop around 11:30 p.m. and asserted she was stopped by the police approximately 30 minutes later. Rennier did not remember the police officers telling her why she was pulled over and she was not issued any citation. On cross-examination, she acknowledged that she was drinking alcohol in the car and when she made a left turn in her vehicle just prior to being stopped by the police, she was talking to defendant and not "paying too much attention."

¶ 22        Defendant also called Castles and Dowis as witnesses. Castles asserted she pulled Rennier's vehicle over after it made a left turn and "came into [Castles's] lane, nearly hitting [her police vehicle]." Ultimately, she did not issue Rennier a traffic citation, stating she was training the other officer that was with her regarding "the other crimes that we had found during the traffic stop, and [she] just didn't issue a citation." Castles also stated that Rennier was "very cooperative" and she did not normally issue a citation "if they are cooperative." Although no citation was issued, Castles did issue a verbal warning. On cross-examination, Castles clarified that she "conducted the stop for traffic code violations" and that Rennier's vehicle had crossed into her lane.

¶ 23        Dowis described being on patrol with Castles and observing Rennier's red Ford Fusion make a left turn into the police vehicle's westbound lane of travel before it "over-corrected back" into its appropriate, eastbound lane. Thereafter, Castles initiated a traffic stop. Dowis further testified that no traffic citation was issued as a result of the stop, but a verbal warning was given. He identified the traffic violation that was the basis for the stop as improper lane usage.

¶ 24        Ultimately, the trial court denied defendant's motion. It found justification for the police officers to conduct an investigatory stop based on their observation of motor vehicle

violations by Rennier when making the left turn that preceded the stop. Following the court's ruling, the following colloquy occurred between the court and the State:

"MR. MOSHER [(ASSISTANT STATE'S ATTORNEY)]: Your Honor, we didn't go fully into the duration of the stop. It was raised in [defendant's] original motion. I think it was just judged not to be a very good issue for the defense. If, you know, at some point in the future that this lawyer or another lawyer if there's a new Motion to Suppress, based on that issue or any other issue related to this stop or this search, I can't control them filing that, but I'm, I guess, just laying down a marker that I am going to object to any further Motions to Suppress.

THE COURT: Well, there's not going to be any further Motions to Suppress in this case. All issues have been litigated at this level, and so I won't entertain any more motions at this time, so we are proceeding to trial[.]"

¶ 25        In November 2017, defendant's bench trial was conducted, and the trial court found him guilty of each charged offense. In December 2017, defendant filed a posttrial motion. Relevant to this appeal, he argued the court erred by denying his motions to suppress evidence based on claims that (1) the officers lacked "reasonable suspicion to conduct a traffic stop," (2) the pat down of defendant's person was illegal, and (3) evidence was illegally seized from Rennier's vehicle.

¶ 26        In January 2018, the trial court conducted defendant's sentencing hearing. At the outset of the hearing it considered and denied defendant's posttrial motion. The court then proceeded with sentencing and sentenced defendant to 15 years in prison for being an armed habitual criminal. Defendant filed a motion to reconsider his sentence, which the court also denied.

¶ 27        This appeal followed.

¶ 28                                II. ANALYSIS

¶ 29    On appeal, defendant argues the trial court erred by denying his request to suppress evidence in the case. He contends he was unlawfully seized in violation of his fourth amendment rights (U.S. Const., amend. IV) when the police improperly prolonged the traffic stop of Rennier's vehicle beyond the mission of the stop (1) to "run [his] name through the police computer" and (2) by asking Rennier for consent to search her car. Defendant maintains his unlawful seizure requires suppression of both the handgun found in Rennier's car and the bulletproof vest that was discovered during the pat down of his person.

¶ 30    Initially, the State argues that defendant failed to preserve this issue for appellate review. It asserts that although defendant filed motions to suppress which contained the allegation that the traffic stop was unlawfully prolonged, he ultimately abandoned that particular claim and obtained no ruling upon it. Defendant responds, maintaining his claim was properly preserved. Alternatively, he argues his forfeiture may be excused under the plain-error doctrine.

¶ 31    "To preserve a purported error for consideration by a reviewing court, a defendant must object to the error at trial and raise the error in a posttrial motion." *People v. Sebby*, 2017 IL 119445, ¶ 48, 89 N.E.3d 675. "Failure to do either results in forfeiture." *Id.* Additionally, "[i]t is the responsibility of the party filing a motion to request the trial judge to rule on it, and when no ruling has been made on a motion, the motion is presumed to have been abandoned absent circumstances indicating otherwise." (Internal quotation marks omitted.) *People v. Daniels*, 2016 IL App (4th) 140131, ¶ 72, 58 N.E.3d 902.

¶ 32    Here, we agree with the State that defendant forfeited the claim he raises on appeal by failing to properly raise it with the trial court. As stated, on appeal, defendant argues his seizure during the traffic stop violated his fourth amendment rights because the traffic stop was unlawfully prolonged. Although in his original motion to suppress defendant raised the bare allegation that

"[t]he time of the stop far exceeded what would be considered an appropriate time for" the purpose of the stop, he ultimately failed to further develop that claim or argue it before the court. He never obtained any findings from the court regarding whether any action by Castles or Dowis impermissibly prolonged the stop beyond its intended mission.

¶ 33 Further, while defendant's *pro se* motion to reconsider (which the trial court elected to address) contained the general assertion that Rennier's vehicle was improperly detained, alleging the police had "no right to further detain [Rennier's] vehicle to do an exploratory search," it also did not include the specific claims he now raises on appeal—that the traffic stop was unlawfully prolonged by the officers' decision to "run" his information or their request for Rennier's consent to search. Finally, the issue of an unlawfully prolonged traffic stop was not raised in defendant's posttrial motion or argued at the hearing on that motion. Accordingly, the issue has been forfeited.

¶ 34 Nevertheless, as argued by defendant, a forfeited claim of alleged error may be reviewed pursuant to the plain-error doctrine "when a clear or obvious error occurred and" either (1) "the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant" or (2) "that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process ***." (Internal quotation marks omitted.) *Sebby*, 2017 IL 119445, ¶ 48. "Under both prongs of the plain-error doctrine, the defendant has the burden of persuasion." *People v. Hillier*, 237 Ill. 2d 539, 545, 931 N.E.2d 1184, 1187 (2010). Additionally, "[t]he initial analytical step under either prong of the plain[-]error doctrine is determining whether there was a clear or obvious error at trial." *Sebby*, 2017 IL 119445, ¶ 49.

¶ 35 We note "[a] circuit court's ruling on a motion to suppress presents questions of both fact and law." *People v. Manzo*, 2018 IL 122761, ¶ 25, 129 N.E.3d 1141. On review, the

court's factual findings are given deference and will be reversed only when they are against the manifest weight of the evidence. *Id.* If the trial court's factual findings are accepted, a *de novo* standard of review applies to a determination "of whether suppression was appropriate under those facts." *Id.*

¶ 36        "When a defendant files a motion to suppress evidence, he bears the burden of proof at a hearing on that motion." *People v. Brooks*, 2017 IL 121413, ¶ 22, 104 N.E.3d 417. "A defendant must make a *prima facie* case that the evidence was obtained by an illegal search or seizure." *Id.* "A *prima facie* showing means that the defendant has the primary responsibility for establishing the factual and legal bases for the motion to suppress." *Id.* "If a defendant makes a *prima facie* case, the burden shifts to the State to present evidence to counter the defendant's *prima facie* case." *Id.* "However, the ultimate burden of proof remains with the defendant." *Id.*

¶ 37        "The fourth amendment to the United States Constitution, which applies to the states under the fourteenth amendment, and article I, section 6, of the Illinois Constitution protect people against unreasonable searches and seizures." *People v. Timmsen*, 2016 IL 118181, ¶ 9, 50 N.E.3d 1092. "The touchstone of the fourth amendment is 'the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security.' " *Id.* (quoting *Terry v. Ohio*, 392 U.S. 1, 19 (1968)).

¶ 38        "The law is well settled that stopping a vehicle and detaining its occupants constitute a 'seizure' within the meaning of the fourth amendment." *Id.* Such seizures are analyzed under the principles set forth by the Supreme Court in *Terry*, which provides that "a police officer may conduct a brief, investigatory stop of a person where the officer reasonably believes that the person has committed, or is about to commit, a crime." *Id.* (citing *Terry*, 392 U.S. at 22). "As a general matter, the decision to stop an automobile is reasonable where the police have probable

cause to believe that a traffic violation has occurred." (Internal quotation marks omitted.) *People v. Hackett*, 2012 IL 111781, ¶ 20, 971 N.E.2d 1058. However, a traffic stop that is lawful at its inception can become unlawful "if it is prolonged beyond the time reasonably required to complete the traffic stop." (Internal quotation marks omitted.) *People v. Harris*, 228 Ill. 2d 222, 235-36, 886 N.E.2d 947, 956-57 (2008). "[W]here an officer's confinement of a person goes beyond the limited restraint of a *Terry* investigative stop, a subsequent consent to search may be found to be tainted by the illegality." *People v. Brownlee*, 186 Ill. 2d 501, 519, 713 N.E.2d 556, 565 (1999).

¶ 39    On appeal, defendant concedes that "the police had probable cause to initiate a traffic stop" and, thus, the initial stop was lawful. Again, however, he contends that the trial court erred by denying his motion to suppress evidence because the stop was unlawfully prolonged beyond the time reasonably required to complete the stop, resulting in a violation of his fourth amendment rights. In responding to this claim, the State asserts that because defendant was a "mere passenger" of Rennier's vehicle with no "legitimate expectation of privacy" in the vehicle, he lacks standing to "object to an unreasonably prolonged seizure of the car." On this point, we disagree with the State.

¶ 40    "The fourth[-]amendment protection against unreasonable government search and seizure extends only to individuals who have a reasonable expectation of privacy in the place searched or property seized." *People v. Johnson*, 114 Ill. 2d 170, 191, 499 N.E.2d 1355, 1364 (1986). In other words, "[f]ourth-amendment rights are personal, and the government violates a defendant's fourth-amendment rights by invading the defendant's own legitimate expectation of privacy." (Emphasis omitted.) *People v. Ferris*, 2014 IL App (4th) 130657, ¶ 43, 9 N.E.3d 1126 (citing *United States v. Payner*, 447 U.S. 727, 731 (1980)).

¶ 41    "[T]he general rule is that a passenger lacks standing to challenge a search of

another's car unless the passenger had a legitimate expectation of privacy in the place searched." *People v. McCoy*, 269 Ill. App. 3d 587, 592, 646 N.E.2d 1361, 1365 (1995); *Rakas v. Illinois*, 439 U.S. 128, 148-49 (1978) (stating a mere passenger does not normally have a legitimate expectation of privacy in the area under the seat of the car). However, as an individual "seized" during a traffic stop, a passenger does have "standing to challenge a *stop's* constitutionality." (Emphasis added.) *Arizona v. Johnson*, 555 U.S. 323, 332 (2009). As expressed above, one basis for finding a traffic stop unconstitutional is "if it is prolonged beyond the time reasonably required to complete the traffic stop." (Internal quotation marks omitted.) *Harris*, 228 Ill. 2d at 235-36.

¶ 42    On appeal, defendant is not just challenging the detention or search of Rennier's vehicle as unlawful. Rather, he is challenging his own seizure and detention as an occupant of the stopped vehicle on the basis that it was excessive in duration. He has standing to make this claim. Additionally, we find the case authority relied upon by the State is distinguishable in that it involved the question of a defendant's standing to challenge the prolonged seizure of another's car, not the defendant's own prolonged seizure. See *Ferris*, 2014 IL App (4th) 130657, ¶ 48 (questioning whether the defendant had "standing to argue that the police violated the fourth amendment by towing and placing a hold on [another person's] car, thereby unreasonably prolonging the seizure of the car").

¶ 43    Addressing defendant's argument that the underlying traffic stop was unlawfully prolonged beyond its mission, we note "[a] seizure for a traffic violation justifies a police investigation of that violation." *Rodriguez v. United States*, 575 U.S. 348, 354 (2015). "Like a *Terry* stop, the tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission' ***." *Id.* That mission includes (1) addressing the traffic violation that warranted the stop and (2) attending to related safety concerns. *Id.* Thus, " 'ordinary inquiries

- 14 -

incident to [the traffic] stop[,]' " include "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." *Id.* at 355 (quoting *Illinois v. Caballes*, 543 U.S. 405, 408 (2005)). Additionally, an officer's "safety interest stems from the mission of the stop itself." *Id.* at 356. "Traffic stops are especially fraught with danger to police officers, [citation], so an officer may need to take certain negligibly burdensome precautions in order to complete his mission safely." (Internal quotation marks omitted.) *Id.*

¶ 44　　　　"Authority for [a traffic stop] seizure *** ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." *Id.* at 354; see also *People v. Musgrave*, 2019 IL App (4th) 170106, ¶ 38, 141 N.E.3d 320 ("Generally, a [valid] traffic stop ends when the paperwork of the driver and any passengers has been returned to them and the purpose of the stop has been resolved." (Internal quotation marks omitted.)). Although a police officer "may conduct certain unrelated checks during an otherwise lawful traffic stop," he or she "may not do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual." *Rodriguez*, 575 U.S. at 355; *Harris*, 228 Ill. 2d at 237 (stating "a warrant check on the occupants of a lawfully stopped vehicle does not violate fourth amendment rights, so long as the duration of the stop is not unnecessarily prolonged for the purpose of conducting the check and the stop is 'otherwise executed in a reasonable manner' "). Ultimately, "[t]he seizure remains lawful only 'so long as [unrelated] inquiries do not measurably extend the duration of the stop.' " *Rodriguez,* 575 U.S. at 355 (quoting *Johnson*, 555 U.S. at 333). The critical question is not when during the stop the challenged action occurs but whether performing the act "adds time" to the stop. *Id.* at 357.

¶ 45　　　　Defendant's initial claim on appeal is that the underlying traffic stop was

unlawfully prolonged because the police chose to "run [his] name through the police computer." He argues that before performing a computerized check of his information, the officers had already confirmed Rennier's information and that she had no warrants. He maintains that under such circumstances, tasks related to the stop's mission were complete and the officers should have concluded the stop rather than cause delay by checking his information. We disagree.

¶ 46 First, because defendant did not raise this issue in his motion to suppress, the duration of the stop was not the focus of either suppression hearing and facts relevant to the issue were not the focus of the parties or the trial court. See *People v. Mitchell*, 78 Ill. App. 3d 851, 853, 397 N.E.2d 569, 570 (1979) (noting the State "is ordinarily not required to make proof of the reasonableness of [a] seizure *** unless that question is raised by a defense motion to suppress" and finding it not "proper to pass upon the validity of the search" given the undeveloped record); *People v. Hughes*, 2015 IL 117242, ¶ 38, 69 N.E.3d 791 (stating "new factual theories on appeal deprive the formerly prevailing party of the opportunity to present evidence on that point"). As a result, only limited evidence was adduced regarding the actions of the officers during the stop and the timing of those actions. Further, the State was not given the opportunity to present evidence in response to this specific claim. Given the lack of a fully developed record, we find it inappropriate and speculative to hold, as defendant suggests, that the officers' action in "running" his name unlawfully added time to the stop.

¶ 47 In particular, we note testimony at the suppression hearing showed the officers "ran both [Rennier's and defendant's] names and *** their criminal histories." They performed a computerized check of Rennier's information first and then defendant's information. Dowis testified that it took "30 seconds to a minute" to perform both checks. Their second approach to the vehicle occurred approximately two to three minutes later. Significantly, the record does not

- 16 -

reflect what other actions, if any, occurred when the police officers returned to their vehicle; what occurred during the additional two- to three-minute period after the information checks and before the second approach to Rennier's vehicle; or whether any of those actions were tied to the mission of the stop.

¶ 48    On appeal, defendant suggests that by checking Rennier's information prior to defendant's, the officers "knew Rennier had no warrants, [and] had confirmed her proper insurance, license, and registration," thus completing tasks tied to the traffic stop. However, the evidence that was presented established only that the officers performed a computerized check of Rennier's "name" and "criminal history" before doing the same on defendant. There is no factual support for defendant's contention that all relevant information tied to the traffic stop would have been "confirmed" by such a check. It is entirely possible that tasks related to the mission of the stop, like documenting the stop or inspecting the paperwork Rennier provided in connection with her license, insurance, and registration, remained. See *Musgrave*, 2019 IL App (4th) 170106, ¶¶ 46-49 (finding a traffic stop was not unlawfully prolonged when one police officer "work[ed] on matters related to the traffic stop" while another officer attended to unrelated matters).

¶ 49    Although the check of defendant's name and criminal history necessarily took some amount of time, based on this record we cannot find that it unreasonably prolonged or added time the stop. Accordingly, we find defendant has failed to establish the occurrence of a "clear or obvious error."

¶ 50    Further, we note that case authority also exists for the proposition that asking occupants of a lawfully stopped vehicle, including passengers, for identification and running warrant checks may be viewed as tasks tied to officer safety concerns and, thus, included within the mission of a stop. *People v. McKelvy*, 2019 IL App (2d) 180630, ¶ 20, n.3, 136 N.E.3d 1101

(citing *State v. Martinez*, 2017 UT 43, ¶ 16, 424 P.3d 83 (collecting cases finding that an officer may request and check a passenger's identification due to safety risks)).

¶ 51    Defendant argues that in this case, evidence showed Castles and Dowis lacked any concern for officer safety when checking defendant's name and criminal history. We disagree.

¶ 52    Here, although Dowis denied observing any "alarming" behavior during the traffic stop and stated defendant did not appear nervous, he would not agree that there was "no officer safety issue" at the time of the "first approach" to Rennier's vehicle, noting the officers "didn't know who the individuals were in the vehicle." Further, Dowis's testimony showed the officers "ran" the names and criminal histories of both Rennier and defendant because the stop occurred late at night and in a "known drug area." We reject defendant's suggestion that these asserted bases are unrelated to the issue of officer safety. Rather, it stands to reason that traffic stops that occur at night, when it might be more difficult to observe the actions of a vehicle's occupants, and in an area of increased criminal activity pose a greater risk to officer safety than ordinary traffic stops that do not involve either factor.

¶ 53    Finally, to support his argument on appeal, defendant relies heavily on the First District's decision in *People v. Bass*, 2019 IL App (1st) 160640, 144 N.E.3d 542. There, police officers pulled over a vehicle in which the defendant was a passenger for running a red light. *Id.* ¶ 8. "For safety reasons, the officers had all of the passengers get out of the van." *Id.* They also ran a "name check" on the defendant although they did not observe him violate any laws or act suspiciously. *Id.* As a result of the name check, the officer discovered an "investigative alert" and arrested the defendant. *Id.*

¶ 54    On review, the First District found the traffic stop was "unconstitutionally extended" by the name check. *Id.* ¶ 73. In so holding, it rejected an argument by the State that the

check "was related to the mission of the stop due to officer safety," finding "no safety justification *** for running name checks on the passengers when they are already in the control of the officers." *Id.* ¶ 76. The court also determined as follows:

> "At oral argument, the State conceded that it had the burden to show that the officers' conduct was lawful because [the defendant] made a *prima facie* case that the officers' check of the passengers' identifications was unrelated to the mission of the stop. The record does not reveal when [the defendant's] name check was run in relation to the name checks of the other passengers, the LEADS check on the driver, and the completion of the TSS card [that documented the stop]. The State's failure to clarify the timeline of the stop and thereby meet its burden leads us to conclude that the motion to suppress should have been granted." *Id.* ¶ 78.

¶ 55 We find *Bass* distinguishable from the circumstances of the present case. Here, there has been no concession by the State that the challenged information check was unrelated to the mission of the stop, nor do the facts here show the information check was performed at a time when the officers had taken some other action to ensure their safety, such as removing defendant from the car. Finally, defendant had the burden in this case to show both that suppression was warranted and the occurrence of plain error. For the reasons expressed above, the record does not establish a factual basis for his motion to suppress based on an unlawfully prolonged detention due to the check of his information. Under these circumstances, *Bass* does not support defendant's claim of a fourth amendment violation as alleged.

¶ 56 Finally, on appeal defendant also argues the underlying traffic stop was impermissibly prolonged by the officers' request to search Rennier's vehicle. He contends the officers completed the mission of the stop "once they ran Rennier's name and found no warrant

- 19 -

and confirmed she had a valid license and registration." He asserts the officers should have completed the stop at that time by returning Rennier's paperwork and issuing either a citation or warning rather than seeking consent to search her car. Defendant maintains the request for consent to search measurably extended the duration of the stop, rendering his seizure unlawful.

¶ 57    Here, defendant relies on two cases which support his ultimate conclusion that a request for consent to search unlawfully prolongs a traffic stop when the request is made after all of the tasks tied to the traffic violation are, or reasonably should have been, completed. See *People v. Miller*, 345 Ill. App. 3d 836, 843, 803 N.E.2d 610, 615-16, (2004) (finding that because a police officer "had nothing more to do to complete the traffic stop" when he requested that the defendant exit his vehicle, the stop was unlawfully prolonged); *People v. Al Burei*, 404 Ill. App. 3d 558, 566, 937 N.E.2d 297, 304 (2010) (holding that seizure of the defendant during a traffic stop became unlawful when a police officer continued to question the defendant and obtained his consent for a search beyond the time reasonably required to complete the stop's purpose). Again, however, we find the facts presented in this case fail to show any "clear or obvious error."

¶ 58    As discussed above, because defendant did not maintain a challenge to the duration of the traffic stop before the trial court, evidence relevant to those issues was not a focus of the underlying proceedings and the record is undeveloped as to the pertinent facts. Contrary to defendant's assertion, the record does not establish the exact point at which Castles and Dowis were "done with the stop." Further, critical to the issue of a request for consent to search, the record does not show when Rennier's paperwork was returned to her. In *People v. Cosby*, 231 Ill. 2d 262, 276, 898 N.E.2d 603, 612 (2008), the supreme court noted that the requests for consent to search in the consolidated cases before it "followed the officers' returning of the defendants' paperwork." It concluded, "[a]t that point, the traffic stops came to an end" and "[t]he relevant question [was]

whether the officers' actions after the initial traffic stops had concluded constituted a second seizure of either defendant." *Id.* In this case, defendant challenges only the initial traffic stop seizure as unlawfully prolonged. He does not argue an unlawful second seizure of his person.

¶ 59        Here, we find no reference in the record, and defendant does not direct us to any, regarding when Rennier's license and insurance card was returned to her, be it at the time of the officers' second approach to the vehicle or after their search. Once again, we find it likely that this omission is due to the fact that defendant did not pursue a challenge to the duration of the stop when seeking to suppress the evidence against him. Under these circumstances, defendant has not met his burden of showing an unlawful seizure or any "clear or obvious error."

¶ 60                          III. CONCLUSION

¶ 61        For the reasons stated, we affirm the trial court's judgment.

¶ 62        Affirmed.